## HAYDEN, Appellant, v. LAUFFENBURGER et al.

### Division One, June 12, 1900.

1. **What Constitutes Payment:** MONEY OR THINGS. Where a debt is payable in money, according to the tenor of the obligation, it can be paid in other things only by an agreement of the debtor to give and the creditor to receive something else in satisfaction thereof, and that something else must be actually given and received.

2. ————: MARKING NOTES PAID. The fact that the arbitrators turn notes over to the maker and he marks them "paid in full" is a circumstance properly admissible in evidence on the question of payment, but they do not constitute payment. And if there has in fact been no payment, the title acquired by a sale under a deed of trust given to secure the debt will not be invalidated by the mistaken delivery of the mortgage obligation to the mortgagor and his marking it "paid in full."

3. ————: DEED OF TRUST: MERGER. The mortgagor made a deed of trust on the lot in controversy and a chattel mortgage on certain horses to secure the payment of four notes due a bank. A controversy arising as to the amount of payments made, the matter was submitted to arbitration, and the award was that the bank should have the lot and one or two horses in full satisfaction of the notes and costs, and the mortgagor the rest of the horses, and the bank was given thirty days to decide whether, in order to get title to

Hayden v. Lauffenburger.

the lot, it would foreclose the deed of trust or take a quitclaim deed from the mortgagor, and choosing the quitclaim it was executed and the bank given possession of the lot, and one of the arbitrators, without the bank's knowledge, gave the notes to the mortgagor and he marked them "paid in full," and the bank sold the lot to the plaintiff. The quitclaim was not recorded, nor the deed of trust released of record. A few months later a judgment was rendered against the mortgagor and, the quitclaim not being of record, the lot was sold under execution to this defendant in ejectment, who is in possession under his sheriff's deed. Later the mortgagor sent the notes to the plaintiff and he caused the deed of trust to be foreclosed, at which sale the bank became the purchaser and then made a second deed to plaintiff. *Held,* that the notes were not paid and the deed of trust was not satisfied before the sale by the trustee, in such a way as to make the sheriff's deed a paramount title to that of the trustee. *Held,* also, that there was no merger of the deed of trust in the quitclaim deed, for three reasons: 1, it was not intended by the parties that there should be such an extinguishment of the mortgage as to make the bank's title date from the date of the quitclaim deed; 2, such a merger would destroy the interest of the mortgagee, giving him nothing for his debt; 3, the intervening judgment lien under which the defendant claims, is an effectual bar to the merger.

4. **Equity:** ADVANTAGE OF ADVERSARY. Equity sometimes relieves one of the consequences of his unfortunate blunder, but it never aids another to take an unfair advantage of that blunder: It will not permit one who claims relief against a foreclosure to a deed of trust, to make the basis of the defense in ejectment the blunder of a bank in accepting a quitclaim deed from the mortgagor, when a foreclosure would have avoided all contest over the title, if thereby the defendant is given an advantage which he would not have had had such blunder not been committed.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville,* Judge.

REVERSED AND REMANDED (*with directions*).

*Massey & Tatlow* for appellant.

(1)   A full and complete legal title is shown from the testimony to be in the plaintiff, and in this action he is enti-

tled to recover.    Schanewerk v. Hoberecht, 117 Mo. 22;
Keet v. Baker, 141 Mo. 175; Leeper v. Lyon, 68 Mo. 216;
Hunt v. Selleck, 118 Mo. 588.    (2) There is no merger in
this case—would have been none even if satisfaction of the
deed of trust had been legally made on the record.    It was
the intention of all of the parties to the deed of trust, that it
should be kept alive until legal title of the premises should
be vested in Swinney Banking Company, and equity will keep
alive a mortgage, even after the debt is paid, if it is necessary
to preserve the rights of mortgagor or mortgagee.    Christy
v. Scott, 31 Mo. App. 331; Walker v. Goodsill, 54 Mo. App.
631; Swope v. Leffenwill, 72 Mo. 348; Orrick v. Durham, 79
Mo. 174; Collins v. Stocking, 98 Mo. 290; Williams v.
Brownlee, 101 Mo. 309; Ess v. Griffith, 128 Mo. 50; Hutch-
inson v. Swartzetter, 31 N. J. Eq. 205; Lilly v. Palmer, 51
Ill. 331; Frey v. Vanderhoof, 15 Wis. 397; Ladd v. Wiggins,
69 Am. Dec. 551; Vannece v. Bergan, 85 Am. Dec. 531.


*Wm. O. Mead* and *T. T. Loy* for respondents.


(1)    The deed of trust to the sheriff is void.    He has no
power to contract in his official capacity for a conveyance to
him in his official character, nor to accept a deed.    Douthitt
v. Stinson, 63 Mo. 268; Martindale on Conveyancing, sections
34, 68, 70, 121, 362.    (2)    The deed of trust from Dunna-
way to the Swinney Banking Company provides for a sale
"at Springfield, in the town of Springfield" which is too in-
definite and uncertain to justify a sale thereunder even
though the sheriff had power to sell, and a sale and deed
thereunder can not be sustained in an action at law.    (3)
The sale is void for the reason that the notes were paid off
and were in the hands of the maker, marked "paid in full,"
and the sale could not have been made at the request of the
legal holder of the notes.

VALLIANT, J.—Ejectment for a town lot in Ash Grove.

The real issues in which the case turns are tendered on the affirmative answer of defendant Brock, in the nature of an equitable cross-action. The other defendant is the tenant of Brock,

The answer states substantially that one Dunnaway was the owner in fee of the property and that on the twenty-ninth of March, 1893, he executed a deed of trust which was duly recorded, conveying the same to a trustee to secure certain notes that he owed to Swinney Banking Company; that thereafter Dunnaway paid the notes and the bank returned them to him, and thereafter defendant Brock became the purchaser of the premises at a sheriff's sale under a judgment against Dunnaway, received the sheriff's deed to the same and thereby became the owner of the land in fee simple; that afterwards the Swinney Banking Company became involved and its affairs passed into the hands of receivers; and after that one Swinney, who was the chief stockholder in the bank, conspired with Dunnaway and the plaintiff to defraud the defendant, and in furtherance of that purpose caused the premises to be sold under the power contained in the deed of trust (which had not been released of record); that the receivers became the purchasers at the sale and conveyed the same to plaintiff; that both the receivers and plaintiff purchased with knowledge of the facts above stated and paid no consideration for their purchase. The charge in the cross-bill is that the transaction complained of was a fraud and conferred no valid title on plaintiff, but that his deed clouds the defendant's title and the prayer is that it and the deed of trust and the trustee's deed be cancelled. The reply admits that Dunnaway was the owner, that he executed the deed of trust, and denies the other allegations.

The evidence shows the facts to be as follows: The

deed of trust dated March 29, 1893, was to secure four notes, dated January, 1893, aggregating something over $500; the bank also had a chattel mortgage on some horses to cover the same debt.   In June, 1893, a controversy arose between the bank and Dunnaway in regard to their affairs, involving among other questions the amount of credits he was entitled to on the notes, and they agreed to leave the whole business to arbitration.   Each selected one arbitrator and those two being unable to agree called in a third, and an award was agreed upon, which was in effect that the bank should have the lot and one or two of the horses, in full satisfaction of the notes and expenses incurred.   Dunnaway was to have the rest of the horses, three or five, and the bank was to be given time, probably thirty days, in which to decide whether it would foreclose the deed of trust or take a quitclaim deed from Dunnaway.   In either case the bank was to have the property for the debt and expenses incurred, and Dunnaway was to have the notes in exchange for the property.   If the bank should foreclose, and a sum sufficient to pay the notes should not be realized, still the notes were to be returned to Dunnaway and the bank was to pay the cost of the foreclosure.   The bank was also to pay the cost of the arbitration, and pay the livery bill for taking care of the horses.   The award was in writing, but was not delivered to either of the parties, and was lost; it was never returned into court, and no judicial action was taken on it.   The horses awarded to Dunnaway were delivered to him, and he executed a quitclaim deed to the lot to Swinney for the bank, dated June 26, 1893; Swinney took possession, added some improvements to the house and premises, and then sold the property to the plaintiff, and gave him possession.   The quitclaim deed was not recorded, and the deed of trust was not released on the record.   After the arbitration was over, just how long after is not shown,

probably a month, one of the arbitrators, without the bank's knowledge, gave the notes to Dunnaway. In June, 1897, Dunnaway returned the notes to the plaintiff, and therefore he caused the deed of trust to be foreclosed by the trustee, at which sale the receivers of the bank became the purchasers and made a deed conveying it to the plaintiff. That is the plaintiff's title.

On June 2, 1893, a judgment was rendered against Dunnaway in a justice's court of Greene county, for $82.75, a transcript of which was filed in the circuit clerk's office on June 6, 1893. In September, 1895, execution was issued on the judgment, under which the sheriff in due course sold this property on October 12, 1895, to defendant Brock, and made her a deed to the same and she through her tenant and codefendant, is now in possession under that sheriff's deed and that is her title.

From the first to the tenth of October, 1895, while the sheriff's advertisement of this sale was pending, one Allen conducted a correspondence by mail with Dunnaway, who was then living in Arkansas, in which he represented to Dunnaway that he, Allen, had bought the lot, without saying from whom or in what manner, and desired to clear his title by having the deed of trust satisfied on the record, asking him to send him the notes, promising to give him $15 if he would do so, and threatening to prosecute him if he did not. The result was Dunnaway consulted an attorney in Arkansas who advised him to mark the notes "paid in full" which he did, and sent them, for inspection, to Allen, by this attorney, who carried them in person and returned them to Dunnaway with the $15 Allen had promised. Who Allen was acting for in the matter is not entirely clear from the evidence, probably for defendant Brock; at all events, he was not acting for the plaintiff or the bank. Dunnaway then kept the notes until he sent them to the plaintiff as above stated in June, 1897, shortly before the foreclosure sale.

There was a finding and judgment for defendants, and the plaintiff appealed.

Since the answer states that Dunnaway was the common source of title, and the evidence shows a title from him through the deed of trust and trustee's deed to plaintiff, which is senior and therefore superior to the title of defendant derived from the same source, the finding should be for the plaintiff on his cause of action, unless the defendant ought to prevail in his equitable cross-action.

The deed of trust antedates the justice's judgment and the filing of the transcript in the clerk's office, several months. The answer does not assail the validity of the deed of trust, on the contrary pleads it as if it were a valid instrument, nor is there a suggestion in the answer of any irregularity or defect in the execution of the trust in making the sale. The only ground on which the plaintiff's title is attacked is that the notes were paid and that the deed of trust for that reason was satisfied before the trustee made the sale. The defendant's equitable cross-action must stand or fall with that proposition.

There is no pretense that the notes were paid in money according to their tenor, and if they were paid otherwise, it must have been by agreement of the debtor to give and the creditor to receive something else in satisfaction of the debt, and that something else so agreed upon must have been actually given and received.

Now what did the debtor agree to give and the creditor to receive in lieu of the money called for by the notes? It was that which the arbitrators awarded as the just equivalent, namely, the property in controversy in this suit. If the result of the acts of the parties after the announcement of the award was such that the creditor actually obtained the property awarded him, then the debt was paid, otherwise not. We are now listening to the defendant's appeal to equity for relief against the plaintiff's apparent legal title; it is under

the principles of equity jurisprudence, and in a forum where good conscience must approve, that the defendant's claim is to be judged. If the result of all the transactions shown in the evidence is such that the defendant has acquired the property, what has the creditor received for his debt, or how has his debt been paid? The theory of the defendant's case is that the bank blundered in the matter, by taking a quitclaim deed instead of foreclosing the deed of trust at that time, and thereby unwittingly did what in effect was a release of the security for its debt, and the defendant has taken advantage of that situation; it is not expressed in exactly that language in respondent's brief, but that is what it means. If that is the situation, there is no justice in the defendant's claim and equity will leave it in the hands of the law. Equity sometimes relieves one of the consequences of his unfortunate blunder, but it never aids another to take an unfair advantage of it. The notes in question can in no sense be adjudged to have been paid, unless at the same time it be adjudged that the bank acquired the property in question. The fact that the notes were given up by one of the arbitrators, who supposed the matter was settled, to Dunnaway, and the fact that when he sent them to Allen to inspect he marked them "paid in full" are circumstances properly admissible in evidence on the question of payment, but they do not constitute payment nor do they render the trustee's sale invalid.

The point on which the case probably turned in the mind of the chancellor was the effect of the taking of the quitclaim deed by the bank, the conclusion being that by that act the equitable title became merged in the legal and the security under the deed of trust thereby extinguished. But whilst the consequence in law of the meeting of the equitable and legal titles in one person is usually to merge the former in the latter, yet in equity that is frequently not suffered to be done. The law on this subject is so well expressed by a learned text writer that we can not do better

than copy it: "In law a merger always takes place when a greater estate and a less coincide and meet in one and the same person, in one and the same right, without any intermediate estate. The lesser estate is annihilated or merged in the greater. But 'upon this subject,' says Sir WILLIAM GRANT, 'a court of equity is not guided by the rules of law. It will sometimes hold a charge extinguished where it would subsist at law; and sometimes preserve it, when at law it would be merged. The question is upon the intention, actual or presumed, of the person in whom the interests are united.' This intention is a question of fact, and is to be tried and determined in the same manner as are other issues. It comes in to repel the *prima facie* presumption of merger which arises from the union of the legal and equitable estates in the same person at the same time. His intention is generally determined by his interest, though all the attending circumstances are to be considered. . . . . . . An intervening incumbrance or equity of any kind is generally sufficient to prevent a merger of the mortgage with the equity of redemption, provided the incumbrance be not one which the owner has assumed to pay, or one against which he is estopped from defending, whether such incumbrance be an attachment, a levy of execution, another mortgage, or any other lien or equity." [1 Jones on Mortgages (3 Ed.), sec. 848.]

Another eminent writer has said: "But if the conveyance be by a mortgagor to the first mortgagee, where there is a junior incumbrance upon the estate, the interest of the first mortgagee, as such, would not be affected by such a union of interests in him. . Whether it shall work a merger depends upon whether it is for the interest of the mortgagee." [2 Wash. on Real Property (5 Ed.), 202.]

The law as thus stated has heretofore been recognized as the law of this State. [Collins v. Stocking, 98 Mo. 290; Williams v. Brownlee, 101 Mo. 309; Ess v. Griffith, 128 Mo.

50.] In no aspect of the law as above expressed, could the facts of this case constitute a merger or extinguishment of the deed of trust in the quitclaim deed. In the first place, to give it the effect defendant would put upon the transaction, that is such an extinguishment of the mortgage as that the bank's title should date from the date of the quitclaim deed, would be to give an effect never intended by the parties; second, it would destroy the interest of the mortgagee, giving him nothing for his debt; third, the intervening judgment lien under which the defendant claims is an effectual bar to the merger.

When the bank took the quitclaim deed it took possession of the property, but never put the quitclaim deed on record, regarding the deed of trust as its record title. Under the award and agreement, it had the right to foreclose the mortgage if it chose to do so, and the fact that it allowed the time to pass from June, 1893, to July, 1897, before it undertook to foreclose, is of no consequence. The plaintiff was in possession of the property under a deed from the bank, or Swinney acting for the bank, when the sheriff's sale under which defendant claims occurred, and the deed of trust was then shown unsatisfied on the record.

All that the plaintiff in that judgment was entitled to, for its satisfaction, was the equity of redemption owned by Dunnaway at the date of the filing of the justice's transcript in the circuit clerk's office, and that is all the interest the defendant Brock acquired at that sale. If at the date of the quitclaim deed the property was worth more than the debt secured by the deed of trust, the purchaser at the sheriff's sale would have had the right, as against the quitclaim deed, to redeem the mortgage, but since that course was not adopted, and the mortgage has now been regularly foreclosed, the defendant has no further interest in the property.

A point is advanced in the brief for respondent that the

deed of trust being to the "sheriff of Greene county" as party of the second part, is, for that reason, void. But as above said, there is no such issue tendered in the cross-bill, and therefore the point is not here for decision. But whether that feature was a defect or not, the deed would unquestionably have at least the effect of a mortgage as between the grantor and the bank, and since even treating it as mortgage merely, it provides that in case of default, the then acting sheriff of Greene county at the request of the holder of the notes may advertise and sell in the manner thereinafter specified, which was done, and as the cross-bill makes no charge to the contrary, equity will not interfere to impair the effect of the acting trustee's deed.

Upon a proper application of the law to the facts of this case there should have been a finding for the plaintiff on all the issues, and a judgment in his favor for possession of the property in question, and damages for rents and profits. As there was no finding in the trial court of the amount of damages and value of the monthly rental, the cause will have to be remanded for that purpose only.

The judgment is reversed and the cause remanded to the circuit court with directions to cause a jury to be impaneled to assess the plaintiff's damages for the detention of the property, and ascertain its monthly rental value or to make such assessment and finding, by the court itself if the parties should waive a jury, and upon such verdict or finding to render judgment for the plaintiff as prayed in his petition, and dismissing the defendant's cross-action. All concur.