PAUL'S ROD & BEARING, LTD.,
Plaintiff–Appellant,

v.

Patrick and Judith KELLY, Defendants–
Respondents.

No. WD 44011.

Missouri Court of Appeals,
Western District.

Dec. 24, 1991.

Stephen V. Brain, James A. Fluker, Kansas City, for plaintiff-appellant.

Don Witt, Platte City, for defendants-respondents.

Before LOWENSTEIN, C.J., and FENNER and ULRICH, JJ.

LOWENSTEIN, Judge.

The appellant Paul's Rod & Bearing, Ltd. ("Paul's"), brought suit for specific performance on an option contract it entered into with sellers-respondents Patrick and Judith Kelly ("Kelly" or "the Kellys"). The trial court denied relief to Paul's on two bases: one, that the legal description of the real estate in the option contract was too vague to be enforceable, and two, that Kelly had no power to convey the land since they had previously conveyed to a corporation not made a party to the suit.

A brief overview of the case is in order, and as a further aid to understanding the facts, a drawing of the land is attached as Figure 1. Paul's wanted to buy a parcel of land out of a larger tract owned by Kelly. Kelly, for tax purposes, did not want to sell at the price Paul's contract offered. Kelly countered with an offer to sell .75 of an acre of the unplatted, unsurveyed land and gave Paul's an option to purchase an additional .25 of an acre. This was accepted, even though there was no legal description of the area comprised in the option. Within the exercise of the option period Kelly had the land surveyed and platted, never disclosing the existence of an option. Kelly then transferred the .25 acres subject to the option to a corporation owned by him and his wife.

The facts of this case, taken as found by the trial court under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), are fairly straightforward. Little controversy existed during the trial of this case as to the background of the contract for sale with option. Paul's, a corporation, approached Kelly in 1987, concerning sale of an unsurveyed, unplatted, improved lot the Kellys owned as individuals at 6212 N.W. Bell Road. The different areas and boundaries which played a role in the negotiations can be seen in Figure 1. At the time of the contract in question, Kelly owned 21 acres in the area. The real estate which was the focus of negotiations, though unsurveyed, was fenced on three sides, leaving the Bell Road frontage open. The fenced in area comprised .84 acres, a narrow rectangle bounded by Bell Road, NW 63rd (under construction), the Dyster's property, and more property of the Kellys. If one extends the north and south boundaries westward approximately 60 feet from the fence on the west, as shown in Figure 1, one has a full one acre. As discussed below, Kelly ultimately conveyed .75 acres, so that Paul's did not buy outright all the .84 acres included within the fenced area.

This entire case revolves around the area contemplated by the option in the land sale contract.

Kelly and Kenneth Gabbert, Paul's treasurer, began negotiations over the property in June. On June 25, 1987, Gabbert dropped off a contract with Kelly's secretary, reflecting a sale of .84 of an acre, for $150,000. The offer was rejected, and Gabbert and Kelly continued to discuss the property, including the possibility of selling a full acre, with Paul's putting in a second building. At that point, Kelly called his accountant, who advised against selling property for more than $150,000 for 1987 tax year purposes. For this reason, as all parties concur, the acreage itself was reduced to .75 for $149,950, and Kelly suggested to Gabbert an option for a remaining .25 acres (or 10,890 sq. ft.) at $0.95 a square foot, in the final contract which was drafted on June 26, 1987. The description of the property in the option itself is as follows:

> ... not over 10,890 square feet ... adjacent to ... parcel presently being purchased by Buyer ... bordered on the north by 63rd Street, on the South by property presently owned by [the Deister's], the exact square footage ... at the option of Buyer and the legal description of same to be established at the time of said purchase ...

Paul's bought the .75 acres, paid $100 for the option, and took possession during the summer of 1987. The option could be exercised between January 15, 1988, and January 15, 1989.

In March of 1988, Kelly had the property in the area surveyed, including that bought by Paul's, and a 26.23 acre area platted into Bell Road Industrial Park. Paul's .75 acres was also platted as Lot 24, while the property which is indisputably in the direction the option had to go, was platted as a part of Lot 23. At some point, the remaining land owned by the Kelly's was conveyed to the corporation Bell Road Industrial Park, Inc. ("Bell Road"), which is wholly owned by Mr. and Mrs. Kelly. Paul's was aware of the surveying, yet not of the platting of the area, until sometime in the early fall of 1988. On September 21, 1988, Paul's recorded its option contract, and on September 30, 1988, it exercised the full extent of the option by sending a letter by certified mail. Kelly's initial and continuing response was that only property within the fence-line, approximately 3,700 square feet, was contemplated by the option, and refused to transfer more than that amount. After continuing disagreement, this suit was filed on January 30, 1989.

### The out-of-court corporate owner is not subject to specific performance

 Paul's appeals the conclusion of the trial court that Bell Road Industrial Park, Inc. is the owner of the land in controversy, not Kelly, and therefore specific performance is impossible since Bell Road is not before the court. This court agrees with the trial court. This suit did not involve Bell Road in its conception, nor was Bell Road joined. This court suspects that true ownership was unknown for some time. Certainly, Kelly testified on the stand that "he owned the land." Still, no court may force a non-owner to convey land, and legal ownership of the option site resides in Bell Road. Since Bell Road Industrial Park is not before the court, the trial court correctly denied specific performance, and Paul's point on appeal is denied.

 However, Bell Road, as a third party buyer, does take subject to Paul's option if it has actual or constructive notice, *C & J Delivery, Inc. v. Vinyard & Lee & Partners, Inc.*, 647 S.W.2d 564, 569 (Mo.App. 1983). Because Mr. and Mrs. Kelly have actual notice of the option, and because they are both sole owners of and agents of the corporation, notice may be imputed to the corporation, *Iota Management Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 410 (Mo.App.1987) (corporation charged with knowledge of its officers and agents regarding matters within scope of authority even if officers or agents do not communicate knowledge). Bell Road's ownership subject to the option then exists notwithstanding Paul's failure to record the option prior to the transfer to the corporation.

Therefore, given the facts before this court, it appears that Paul's could still bring suit against Bell Road Industrial Park, Inc., within the ten year statute of limitations, to specifically enforce the option exercised on September 30, 1988.[1] This case is not, however, a suit for specific performance against Bell Road as third party buyer.

### A valid option exists

The testimony before the trial court brought out numerous post-contract actions of Kelly that undermine his intention to honor the option at all: Paul's was not told of the imminent platting of the area into an industrial park, the full .25 acre option was not included in the subsequent survey, the platting and surveying done by Kelly completely ignored the option, the land that would have to be part of the option included in another lot which would be too small for building if the option was exercised, the quiet sale of the option area to a corporation wholly owned by Kelly, Kelly's pre-trial answer that he owned the land and the difference between the option price of $0.95 a square foot and from $1.55 to $3.75 a square foot in the currently platted industrial park. Yet based on the facts before it, the trial court made the following conclusions of law: 1) there was no meeting of the minds on which to base a contractual relationship, 2) the description of the real estate is too vague to determine the boundaries, and 3) Paul's is not entitled to specific performance because no tender was made. This court finds these to be erroneous conclusions, and the cause is reversed and remanded on the grounds outlined below.

First, this court finds sufficient evidence of a meeting of the minds. The trial court found none to exist because the parties were not sure of the exact boundaries, or the exact square footage that existed in the areas they discussed, prior to the survey, and because Kelly maintains that he only meant to sell to the fence line, which also marks the end of Dystra's property. A meeting of the minds must exist for a contract to exist, but this is determined objectively by looking at the intent of the parties as expressed by their actual words or acts, *Frensley v. Mills*, 746 S.W.2d 427, 428 (Mo.App.1988). The meeting of the minds essential to formation or contract cannot be found or determined on "undisclosed assumption or secret surmise of either party but must be gathered from intention of the parties as expressed or manifested by their words or acts," *Shofler v. Jordan*, 284 S.W.2d 612, 615 (Mo.App. 1956). Kelly's subjective intent, which is not expressed in the option, does not operate to negate the existence of the contract.

Neither does Kelly's testimony that he meant to sell to the fence-line, which is not expressed in the contract, rise to the level of a mutual mistake or satisfy the test of unilateral mistake. A mutual mistake is "one common to both contracting parties wherein each labors under the *same* misconception as to a past or an existing material fact," *Czarnecki v. Phillips Pipe Line Co.*, 524 S.W.2d 153, 157 (Mo.App.1975) (emphasis added), and means that "both parties did what neither intended to do," *Heinze v. Hobson*, 622 S.W.2d 17, 18 (Mo.App.1981). Further, a court of equity may grant rescission for a unilateral mistake where "mistake of one party is either known to other party or is so obvious, under the circumstances, that it must have been known to him, and the mistake concerns matter so vital that it can be said that parties, because of miscalculation or false information, never actually agree to the same proposition," *Saline County v. Thorp*, 337 Mo. 1140, 88 S.W.2d 183, 185 (Mo.1936).

There is no evidence of mutuality here; Paul's and Kelly are not joined in a common mistake as to the area included in the option. Paul's wanted and the written

---

1. Case law does suggest that a corporation's notice, and so Bell Road's subsequent liability on the option contract, may depend upon whether the Kelly's were acting adversely to the corporation, *Trice v. Lancaster*, 270 S.W.2d 519, 524 (Mo.App.1954) (a corporation is not bound by knowledge concerning a fact which the agent *is interested in concealing from the corporation*, if circumstances show that the agent will not or did not communicate the fact).

contract states one area, which Kelly agreed to in writing, while Kelly later testifies to another area. The disagreement as to Dystra's property lines or the shape of the site cannot be labelled a mutual mistake, when neither party knew the extent of the property lines at the time of the agreement. There is no mutual mistake, but rather a written contract stating a certain square footage, which Kelly later contends he did not want to sell. Nor can Kelly's belief in the supremacy of his fence line be an example of a "unilateral mistake" upon which to base rescission, when there was absolutely no evidence at trial that Paul's knew of Kelly's hidden intent, or that it was obvious to Paul's, as required by *Saline County v. Thorp*, 88 S.W.2d at 183. This court further notes that Missouri cases appear to require a proof of prior contrary agreements from a party alleging mutual mistake in a written instrument, *see Herhalser v. Herhalser*, 401 S.W.2d 187, 192 (Mo.App.1966). Finally, even given an "honest misunderstanding" as to the area of the option contract, a mutual mistake as to "prophecy or opinion may not be taken as a ground for rescission, where such mistake becomes evident through the passage of time," *Jennings v. Metropolitan Life Ins. Co.*, 166 S.W.2d 339, 344 (Mo.App.1943). At most, the evidence shows that Kelly's subjective intent concerning the option contract was not expressed or included in the final agreement, and therefore is immaterial.

A final note on the reversal of this ground for the trial court's decision. A second basis for the trial court's finding of "misunderstanding" appears to come from Kelly's attorney's notes indicating "to the fence line." The attorney's notes are clearly inadmissable in this context, as extrinsic, parole evidence may not create ambiguities that do not exist on the face of the writing, nor may parol evidence read into a document that which it does not say, *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo.1979). Further, where the agreement is unambiguous, prior parol negotiations cannot be considered to show that the true agreement was not expressed in the writing, *Industrial Bank & Trust*

*Co. v. Hesselberg*, 195 S.W.2d 470, 475 (Mo. 1946). There is nothing vague or ambiguous about the square footage of the option amount.

In sum, the trial court erred in not holding Kelly to the bargain he made with Paul's to sell .75 acres and give an option for .25 acres more. In fact, this court finds it hard to believe Kelly could agree to an option for .25 acres, and still subjectively have meant to go only to the fence line, when the total area within the fence line was .84 acres, not the full acre (.75 + .25) contemplated by the sale and option.

The trial court's second erroneous conclusion was that the description of the real estate was too vague to determine its boundaries. The option itself states the property is to go west from Paul's parcel, along Dystra's property line and N.W. 63rd. *See* Figure 1. Paul's witness, Kenneth Gabbert, admitted that at the execution of the contract, he did not know how far Dystra's property extended, and Kelly apparantly did not either. The trial court felt that it would be making prohibited assumptions in drawing the option boundaries, since the shape of the parcel was not defined in the option contract. However, in *Seabaugh v. Sailer*, 679 S.W.2d 924, 926 (Mo.App.1984), the court found the property description to be adequate where it provided the "key to identification." Here, the writing, plus the attendant circumstances of the surrounding property lines, the road, and the current parcel shape, all point to a rectangular option, extending for the distance needed to fulfill the square feet Paul's desired, up to .25 acres. Holding otherwise would allow Kelly to avoid a bargain he made.

The third erroneous conclusion of the trial court concerns tender rules. In order to exercise its option, Paul's needed only to notify Kelly of its intention to do so. This would have changed the option from a unilateral, irrevocable offer, into a full bilateral contract for the sale of land, *Epstein Hebrew Academy v. Wondell*, 327 S.W.2d 926, 929 (Mo.1959), *Wilson v. Edwards*, 560 S.W.2d 608, 612 (Mo.App.1978).

When Paul's did so, which Kelly concedes occurred on September 30, 1988, well within the option time limit, the option became a contract. At that time, however, Kelly showed his intention not to honor the full extent of the option, and Paul's duty to tender performance in order to have a subsequent right to specific performance was not needed, *Arnold v. Smith*, 436 S.W.2d 719, 723 (Mo.1969), *Cooper v. Mayer*, 312 S.W.2d 127, 130 (Mo.1958). Paul's is therefore entitled to specific performance where tender is unnecessary because it would be a futile and ceremonial gesture, *Blankenship v. Porter*, 479 S.W.2d 409, 413 (Mo. 1972).

Because this court disagrees with the legal conclusions of the trial court which led it to deny relief to Paul's, this case is reversed and remanded. This was tried as a suit for specific performance, and yet the party against whom specific performance was proper was not in court. However, Mr. and Mrs. Kelly are before the court, and have wronged Paul's by not fulfilling the bargain. Paul's therefore has a legal claim against the Kellys for damages from the Kellys' refusal to honor the option contract. Paul's has a right growing out of the transaction, but has chosen the wrong remedy against the Kellys, and in such an instance, this court has the discretion to "remand the cause to permit the petition to be amended, and a retrial of the cause," *Jensen v. Wilson Township*, 346 Mo. 1199, 145 S.W.2d 372, 375 (1940). Specifically, in *Feigenspan v. Pence*, 350 Mo. 821, 168 S.W.2d 1074, 1080 (1943), the Missouri Supreme Court allowed a remand on a specific performance claim to assess money damages instead, noting that the plaintiff "should not be deprived of all relief, for equity having become possessed of the case will not stop short of complete justice." *Id.* In this case, complete justice requires that Paul's be allowed to show proof of the harm caused by the Kellys' failure to uphold the bargain, and the trial court is permitted to render a money judgement. Not only justice, but the interests of judicial economy as well call for this result. "[I]t would add nothing but extra expense and delay to dismiss the appeal and have the appellants" seek the proper remedy, where "[a]ll the facts necessary to decide the pivotal question" are before the court, *Dillaplain v. Lite Industries, Inc.*, 788 S.W.2d 530, 533 (Mo.App.1990) (where court decided issue on appeal, although a writ should have been utilized to bring issue before court). Here, Paul's chose a viable remedy but without having sued the necessary party, and this court will treat this as a suit for damages for breach of the valid option contract shown by the evidence. This places both parties in the position they would have been in if Kelly had avoided the option, by buying Paul's out and openly creating lot 23 out of the option area.

### Conclusion

The judgment of the trial court is reversed, and the cause remanded to determine the extent of legal damages suffered by the Paul's for the Kellys' avoidance of their contractual promise, as determined by the option boundaries found in this opinion. In the event that Bell Road Industrial Park, Inc. either intervenes or is separately sued by Paul's in equity, these causes should be joined.